# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| Varitalk, Inc. | ) Case No. 09-16148 |
| (TIN: 26-0660267) | ) |
| | ) Hon. Goldgar, Bankruptcy Judge, |
| Debtor. | ) Presiding. |
| | ) |
| ———————————— | ) ———————————— |
| | ) |
| Varitalk, Inc., | ) Adv. Pro. No.00383 |
| | ) |
| Plaintiff, | ) Hearing Date: May 11, 2009 |
| | ) Hearing Time: 10:30 a.m. |
| vs. | ) |
| | ) |
| Mark Baker, a California resident, | ) |
| Eclipse, LLC., a California LLC., and | ) |
| Paulo Lanzarotti, | ) |
| | ) |
| Defendants. | ) |

## NOTICE OF MOTION
## REGARDING DEBTOR'S MOTION FOR PRELIMINARY
## <u>INJUNCTION EXTENDING STAY OF LITIGATION TO KEY INDIVIDUALS</u>

PLEASE TAKE NOTICE THAT, on Monday, May 11, 2009, at 10:30 a.m., or as soon thereafter as counsel may be heard, the undersigned attorney intends to appear in Room 613 of the Everett McKinley Dirksen Federal Building, 219 South Dearborn Street, Chicago, Illinois before the Honorable A. Benjamin Goldgar, United States Bankruptcy Judge for the Northern District of Illinois, Eastern Division, and at that time and place shall present the **<u>DEBTOR'S MOTION AND MEMORANDUM OF LAW IN SUPPORT OF PRELIMINARY INJUNCTION EXTENDING STAY OF LITIGATION TO KEY INDIVIDUALS</u>**, at which time and place you may appear and be heard.

Respectfully Submitted,

Varitalk, Inc.

By: /s/  William J. Factor
One of Its Attorneys

William J. Factor (6205675)
The Law Office of William J. Factor, Ltd.
1363 Shermer Road, Suite 224
Northbrook, IL  60062
(847) 239-7248
(847) 574-8233
wfactor@wfactorlaw.com

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Varitalk, Inc. | ) | Case No. 09-16148 |
| (TIN: 26-0660267) | ) | |
| | ) | Hon. Goldgar, Bankruptcy Judge, |
| Debtor. | ) | Presiding. |
| | ) | |
| | ) | |
| Varitalk, Inc., | ) | Adv. Pro. No.00383 |
| | ) | |
| Plaintiff, | ) | Hearing Date: May 11, 2009 |
| | ) | Hearing Time: 10:30 a.m. |
| vs. | ) | |
| | ) | |
| Mark Baker, a California resident, | ) | |
| Eclipse, LLC., a California LLC., and | ) | |
| Paulo Lanzarotti, | ) | |
| | ) | |
| Defendants. | ) | |

**MOTION AND MEMORANDUM OF LAW
IN SUPPORT OF DEBTOR'S MOTION FOR PRELIMINARY
INJUNCTIONEXTENDING STAY OF LITIGATION TO KEY INDIVIDUALS**

Pursuant to, among other authority, 11 U.S.C. § 105 and Fed. R. Bankr. Pro. 7065,

Debtor and Debtor-in-Possession, Varitalk, Inc. ("Varitalk" or "Debtor"), by and through its

undersigned attorneys requests that the Court issue a Preliminary Injunction to enjoin two suits

pending against three individuals who are critical to Varitalk's reorganization efforts, including

its President and its Chairman and its major shareholders.

**I.     INTRODUCTION**

The success of the Debtor's reorganization depends upon enjoining litigation that was

filed in California by a competitor against the Debtor and its three key officers, directors and

shareholders, as well as staying litigation filed in New York against the Debtor and its key

officers, by a short-term disgruntled former employee.

In the absence of a preliminary injunction, Derek Goldberg, Fred Lowe and Steven

Drimmer will be focused almost entirely for the next 30-60 days on defending themselves (and

the Debtor) from the baseless allegations asserted in the California litigation and the New York

litigation.  Quite simply, with its key employees out of commission while on trial in the

California court, the Debtor will not be able to operate its cutting-edge technology and marketing

business, it will not be able to generate revenue, it will not be able to attract and service new

clients -- including a client that is close to signing a deal that will result in a long-term and

substantial revenue stream -- and ultimately it will have to liquidate.

Indeed, the Debtor has a very bright future due, in large measure, to the substantial

investments of time and resources by Messrs. Goldberg, Lowe and Drimmer over the last five

years and the recent successes it has had in the marketplace, as well as their continuing

commitment to the Debtor.  And yet that bright future will be snuffed out if the California

litigation is not stayed as to them.

An injunction also will not prejudice the plaintiffs in the California and New York

litigation at all.  They can point to no harm from having to wait while the Debtor emerges from

bankruptcy to litigate their case against the Debtor's key officers, directors and shareholders.

## II.    BACKGROUND

The debtor, Varitalk, Inc., ("Varitalk") is a small business that combines award winning

creative strategy and writing with patented methods and technologies to generate revenue, to

date, from Internet-based entertainment and brand viral marketing campaigns.  Varitalk's

headquarters are at 53 West Jackson Boulevard in Chicago, Illinois, and it has a creative and

marketing office in Los Angeles, California.  Varitalk currently has two lawsuits pending against

it in the United States District Courts, one in Los Angeles (the "California Suit") and the second

in New York (the "New York" suit).  Its principal officers and directors, Derek Goldberg and

Frederick Lowe, are named Defendants in both suits.  Steven Drimmer, who is one of Varitalk's

founders, its third-largest shareholder, former Chief Executive Officer, and a person who is key

to expanding the Debtor's business opportunities, also is a named Defendant in the California

Suit.

### A.    The Individual Defendants and their Relations to the Company

Frederick Lowe, a resident of the City of Chicago, is the Chairman of Varitalk's Board of

Directors, its Secretary/Treasurer and its acting Chief Executive Officer.  Lowe is essential to

any negotiations regarding high-level commitments of Varitalk's resources, such as long-term

high-volume service agreements.  Lowe is likewise instrumental in negotiating any financing or

investment opportunities for the Debtor.  He also will be instrumental in hiring people to replace

key sales and technology employees lost over the last six months, due in large measure to the

California litigation.  Lowe has sole check signing authority for the Debtor.

Mr. Lowe also is the inventor of the Varitalk Patents and continues to play a leading role

in the company's technology development and deployment.  Currently, he is one of two

employees that have the ability to administer Varitalk's technology.  Additionally, he is the

primary high-level client contact to explain the existing technology and explore additional client

requirements for initial determinations of technological feasibility.  As such, Lowe plays a

pivotal role in both closing sales agreements with clients and saving the company's resources

from unnecessary – and often unbillable – technological explorations.

For his extensive services to Varitalk, Lowe was paid less than $50,000 from 2002

through 2006.  In 2007, his compensation rose to $190,000, and he became entitled to a $50,000

bonus based upon Varitalk's successes, which was earned, but not paid, because of cash flow constraints.  In 2008, Lowe earned $225,000, but received no wages from December 1, 2008 through April 1, 2009.  As a result of accrued, but unpaid compensation, Varitalk owes Lowe substantial sums.

Lowe also has guaranteed Varitalk's $250,000 line of credit with the Hinsdale Bank & Trust and has signed the retainer agreements with the attorneys defending him and Varitalk in the New York and California litigation.  The current balance with those attorneys stands in excess of $150,000.

Before Lowe's involvement with Varitalk, he owned a business called "Period Seven Communications," which he started after a career as Chief Technology Officer at Zondigo.com. It was while he was developing software that Lowe first encountered the concept of personalizing media files, or as it is more commonly known in the art of computer science as "concatenated synthesis."  There, Lowe developed and deployed software that would allow consumers to receive personalized voice mail alerts and greetings where the input was the voice of their callers.

Derek Goldberg, a resident of Sherman Oaks, California, is Varitalk's President and is also a Member of the Board of Directors.  Goldberg, like Lowe, is essential to any negotiations regarding high-level commitments of Varitalk's resources, such as long-term high-volume service agreements.  Goldberg is likewise an essential part of negotiating any financing or investment opportunities for Varitalk.

As the Chief Creative Officer and the person most connected with the current clients, Goldberg also is integral in hiring desperately needed creative and sales personnel to bolster the

revenues lost because of the California litigation.  Goldberg owns approximately 24% of the outstanding shares of Varitalk.

As Chief Creative Officer, Goldberg also is heavily involved in the sales and thus revenue generating process.  When Varitalk pitches its marketing campaigns to clients, it is Goldberg's creative idea for the product that is being pitched.  Additionally, after the client agrees to the campaign, it is Goldberg that works with the client to refine the creative aspects of the resultant campaign.  Additionally, it is Goldberg that has achieved a great deal of success in generating enterprise-wide interest in using Varitalk's creative and technological capabilities for its largest clients, Disney, NBC/Universal, and others in similar businesses.  Goldberg's input and enthusiasm is often cited as the reason for taking a simple campaign idea and extending it through many layers of the client's advertising and its product, to the great benefit of the debtor.

Before his involvement in Varitalk, Goldberg was an award-winning creative consultant, strategist, and writer for Hollywood movie trailer and television movie advertisement campaigns.  As a freelance writer, Goldberg provided integral creativity for some of Hollywood's most successful films, like Men in Black and Spiderman.

For his services to Varitalk, Goldberg earned $195,000 in 2007, a very significant cut in his annual income.  He also was entitled to a bonus of $50,000 for 2007, of which he actually received $25,000.  Goldberg has not been paid since December 2008 and is owed substantial sums in unpaid wages.  In November 2008, Goldberg also loaned Varitalk $40,000.

Stephen Drimmer graduated from Columbia University School of Law in 1970, but has not been a practicing attorney.  Instead, he has been on the West Coast since the 1970s and has developed an extensive network of business and financial contacts.  Currently, he is the Chief Operating Officer of IconMobile, where he has been since leaving Varitalk in September 2005.

7

Drimmer is critical to the Debtor's reorganization.  Among other things, he is one of the founders

of Varitalk and understands its technology and business model and, as such, is chiefly

responsible for negotiating a long-term contract with a customer that will provide substantial

revenue to Varitalk.  Drimmer also continues to drive business to Varitalk through his contacts

and serves as a valuable sounding board to Goldberg and Lowe.

### B.       The Development of the Debtor's Business

In October 2002, Drimmer, Lowe, and others formed a company called GSI, LLC.  The

company operated as Modulate until 2004, when it changed its name to Varitalk, LLC.

Thereafter, it converted to a Delaware, LLC, and finally in April 2007, to a Delaware C-

Corporation (all "Varitalk" unless specifically noted).  At Varitalk's inception,  Drimmer was its

Chief Executive and Lowe provided the needed technological support.  Goldberg started as a

freelance writer and creative consultant and worked for Varitalk on an as needed basis.

Varitalk's business was to commercially exploit methods and technologies related to the

personalization of media files.  Personalization is the concept of allowing the consumer to

interact with a product and interject personal information into the product in some fashion.  A

crude and early example of personalization is a "personalized" newspaper headline printed under

the banner of a well-known publication.  "Personalization" is a concept that is well recognized as

a tool to reach a high-level of connection between the consumer and the producer or distributor.

To personalize "media files," is to allow the consumer to interact with computer files in

order to input some personal information into a resulting media file.  Media files are generally

audio or video files.  Thus, an example of a personalized video media file might be where the

consumer is allowed to place a photo of their face on the body of a well-known celebrity or

athlete.  An example of a personalized audio file might be to allow the user to insert some personal information, like their name, into an otherwise pre-recorded message.

Varitalk combines creative strategy and writing with the methodical and technological expertise to provide personalized media.  Its original entry into the market of personalized media was to provide Internet-based viral marketing to telephones and email.  The revenue stream under this business model comes from, generally, large entertainment companies and large brand names.  Working with these clients, Varitalk would create a marketing campaign where the consumer experience starts with a website and ends with a personalized phone call or an email to a friend, in the voice of a well-known celebrity.

From 2002 through 2004, Varitalk struggled to define a stable method and technology that would allow efficient, high-volume delivery of phone calls and emails.  More troubling for the founders, was the lack of any commercial contract at all until, finally, in the spring of 2004, Drimmer was able to leverage his previous contacts with Warner Brothers film to earn a contract to promote Warner's film, A Cinderella Story.  Warner committed $50,000 to the contract and it went live from June through August 2004.  The campaign (and Varitalk) was featured in several media outlets, including The New Yorker.

From 2004 through 2006, Varitalk struggled to convince advertisers that its marketing campaigns were an efficient and effective means to reach their demographics.  Additionally, the USPTO issued a Non-Final Notice of Rejection of the Varitalk patent applications, originally filed on October 6, 2003.  It was also in the fall of 2006 that Varitalk had its first signs of real commercial viability, with its first award-winning campaign for the Sony film, Snakes on a Plane, featuring the voice of Samuel L. Jackson, the star of that movie.  The Snakes on a Plane campaign was a national hit, reaching millions of consumers.  Varitalk received press from the

New York Times, Forbes Magazine, the CBS News, MSNBC, and other national media outlets. In 2006, it also posted its first profit.  additionally, after Lowe submitted language to the USPTO to further describe the invention and in response to the non-final rejection, the Patent Examiner Allowed and Issued two U.S. Patents to Varitalk for its method, apparatus, and system in creating and delivering personalized media files.  The Patent Examiner recognized and allowed six (6) Independent Claims and eighty (80) Dependent Claims.[1]

In 2007, Varitalk set out to establish itself as the industry leader in Internet-based personalized viral marketing campaigns and explore the possibilities of exploiting more of the Claims allowed in the Patents.  With Lowe and Goldberg both now concentrating on the Company full-time, revenues grew to $1.8 million, with a profit of $300,000 for the 2007 calendar year.  During that year, Varitalk contracted and produced many viral marketing campaigns and was recognized again, by the industry as the leader in this particular type of marketing.

In 2008, Varitalk set out to diversify its revenues stream, concentrating on developing and distributing products rather than services, and on entering foreign markets.  At its peak, Varitalk employed 21, with 16 in Chicago and the rest in California.  During this time, Varitalk negotiated personalized mobile content rights to some of the most recognized characters in the world, like Disney, NBC/Universal, MGM, Island Def Jam Music, and Paramount Pictures. With these characters and Varitalk's patented methods and technologies, Varitalk is able to offer the consumer the first ever personalized mobile content.

---

[1] In Patent law, as the names suggest, if an Independent Claim is found to be invalid for any reason, then all Dependant Claims that rely on that Independent Claim are also found to be invalid.

Mobile content revenue comes in the form of Ring Tones, the sound that the owner of a phone hears when someone calls the owner, Ring-Back-Tones, the sound a caller hears when calling a phone and waiting for the owner to answer, Voice Mail Greetings, the sound a caller hears when a call is forwarded to a voice mail box, and Event Greetings, a sound that is programmed to play upon the happening of an event (for example, to replace the noise of an alarm clock).  Additionally, Varitalk was planning to offer personalized songs to the consumer, so that any lyric in a song that could be changed to the individual (like a person's name, gender, or residence) could be altered to provide the consumer's information.

Because of the impact of the California action upon its operations, Varitalk currently has 13 employees, ten of whom are in Chicago.  It lost its top revenue producing salesperson in February 2009 and has been unable to replace him.  It recently lost one of its top software engineers, who was with the company since 2003, and has not been able to replace him.

###### C.    The Lawsuits

####### 1.    The California Suit

At the core, Baker is alleging that because of his initial contact with Drimmer in 2002, which never amounted to anything and which Baker abandoned, he is somehow entitled to an ownership stake in Varitalk and in the technology that it owns.  Baker persists in these claims notwithstanding facts showing that he had nothing to do with Varitalk's start and its operations. Indeed, for approximately 5 years, Baker did nothing with respect to Varitalk and he only surfaced after Varitalk started to achieve some measure of success, due largely to the efforts of Messrs. Goldberg, Lowe and Drimmer.

In any event, on September 12, 2007, Mark Baker and a company he owns called Eclips, LLC, filed a nine count action in the Superior Court for Los Angeles, California, including, *inter*

11

*alia*, correction of inventorship on the Varitalk patents, misappropriation of trade secrets, fraud, breach of fiduciary duty, and unfair competition. On October 12, 2007, Defendants removed the action to the United States District Court for the Central District of California and it was assigned to Judge Valerie Baker Fairbank, United States District Court Judge.

After two successful Motions to Dismiss, Plaintiffs in the California suit filed the operative pleading alleging breach of fiduciary, misappropriation of trade secrets, conspiracy to defraud, unjust enrichment, unfair competition, accounting, correction of inventorship, and a constructive trust.

The Defendants, including Varitalk, have filed counterclaims in the California litigation, to hold Baker accountable for filing meritless litigation that serves no purpose other than to potentially eliminate a competitor. As such, the counterclaims allege violations of the Sherman/Clayton Anti-Trust Acts, Patent Infringement, and violations of the Lanham Act and California Unfair Competition Act. Defendants also asserted a Cross-Claim for contribution from Kerry Gordy, a California resident, for $50,000 in the event Baker and Eclips were successful on their Complaint.

Under relevant precedent, if Varitalk can show (1) that Baker knew or should have known that his Complaint had no merit (for whatever reason); (2) that Baker brought and continued the claim as a means to compete with Varitalk (which can be inferred from point #1); (3) and that Varitalk has suffered damages of an anti-trust nature (which can be the costs of the litigation). Separately, Varitalk can recover if the litigation was part of an overall scheme to monopolize and that there are acts outside the litigation that tend to infer that attempt. Here, other than the litigation, there is evidence that Baker (1) misrepresents on websites that Eclips, LLC is the owner of certain registered Trademarks, when, in fact, there are none, and (2) in news

12

releases published on PR Press News, Baker is quoted as claiming that "Eclips has patented True Voice Technology", when, in fact neither Eclips nor Baker have any patents.

Additionally, Varitalk's claim for Unfair Competition under the Lanham and Cartwright Acts revolve around the false claims of patent and trademark ownership. Varitalk also asserted a cross-claim against Kerry Gordy for $50,000. As previously mentioned, Gordy was an original Member of Varitalk. In May 2004, Gordy demanded that this interest in Varitalk be purchased by the Company. Varitalk paid Gordy $50,000. Varitalk's claim for contribution is, in essence, that if Varitalk is liable to Baker for any amount, Gordy is the only person that has received money for his interest in the company – and Gordy was, of course, friends with Baker during the entire time – than Baker's recovery should start with Gordy's $50,000.

The gist of Baker's Complaint is that Drimmer, Lowe, and Goldberg took his "Personalization Technology" and that it is this technology that Varitalk uses and is the basis of the '645 and '696 Patents. According to Baker, his method is referred to by audio engineers as "mixing" or "merging" and involves creating a "base track", consisting of a static message with "holes" in it for variable options to be "inserted." Each "hole" in the "base track" would provide the user with several options to choose (the variable options). For instance, the name "hole" could be filled with a number of pre-recorded names. Key to the quality of the Baker method is that all variables have exactly the same length as all other variable options for that particular hole, and that length was determined by the length of the longest variable option. So, for example, to accommodate for the length of the name variable, William, in a personalized song, the singer would stretch out the singing of the shorter name variable, Bob. While this is easy to perform and still provide a seamless transition in personalized songs, the silent gaps are given away when the Baker method is applied to "mixing" *spoken messages.*

The method of the '645 and '696 Patents, on the other hand, call for "concatenation" or "splicing" of audio files. The "master clip" of a Varitalk message has no holes. In fact, if not for contractual restraints on the use of the audio files, Varitalk could cut up the "master clip" any way it wanted, including having separate audio files for each recorded syllable. The variables are connected to the master clips in a "head-to-tail" fashion. Because of this method, the "insert clip" of a Varitalk message need not be any particular length and therefore, whether the audio file is spoken or sung, there are no silent gaps at all.

Varitalk also believes the claims asserted by Baker are barred by the applicable statute of limitations. One judge already has ruled that that Baker's claims were ripe in October/November 2002. As such, Plaintiff must establish under the Discovery Rule (1) he did not have actual knowledge of the Defendants' business activity, (2) he could not have discovered the Defendants' business activity if he exercised due diligence, and (3) the circumstances under which he first learned of the Defendants' business activity. A failure on any of these elements would stop the tolling of the statute and Baker's Complaint would be barred. If the Plaintiff had knowledge, or should have had knowledge, of the Defendants' business activity before September 12, 2003, the entire Complaint is barred and if Baker had knowledge or should have had knowledge before September 12, 2004, then several of the Counts are barred.

In his Original Complaint, Plaintiff alleged first discovery of Defendants' business activity in June 2007. When Defendants pointed out that Plaintiff sent a cease and desist letter to Defendants in October 2006 (right after the Snakes on a Plane rage), Plaintiff amended the Complaint to allege that he discovered the Defendants' business activity in March 2005. When Judge Baker dismissed the Complaint for failure to adequately describe the circumstances of the Discovery, Plaintiff again amended the Complaint.

14

Baker now alleges that he first discovered the Defendants' business activity on March 25, 2005. There are facts in the record, however, which the District Court in California did not consider for purposes of summary judgment, showing that Baker knew or reasonably should have known of any potential claims against Varitalk as early as November of 2002.

Although the District Court in California did not grant summary judgment to Defendants largely on procedural grounds, the Court has noted that "Defendants seem to have the better case." That Court also has noted that "the case against Goldberg seems speculative and weak."

2.      The New York Litigation

In 2005, Lowe, Drimmer, and Goldberg talked with one Paulo Lanzarotti about becoming involved with Varitalk as an officer. Lanzarotti represented that his skills would be an ideal fit for Varitalk. Goldberg and Lowe offered Lanzarotti an agreement for employment. The agreement specifically states that cash compensation is not anticipated or made a part thereof. Instead, the exclusive form of compensation would be Membership Units and would vest at three separate times, assuming Mr. Lanzarotti remained with the Company.

Though Lanzarotti represented otherwise, on information and belief, Lanzarotti was not eligible to be employed in the United States. Lanzarotti assured Varitalk, Lowe, and Goldberg that he would be a perfect fit as an officer of Varitalk, but never informed them that his employment was unlawful under Immigration statutes. Nor did Lanzarotti inform Varitalk, Lowe, or Goldberg that his illegal employment could cause Varitalk to incur fines and other regulatory action.

On February 26, 2009, Lanzarotti filed suit in the Supreme Court of New York, Kings County. The Complaint seeks damages in the amount of $20,000,000. Copies of the Complaint were delivered to Varitalk and Lowe on March 30, 2009. On April 29, 2009 Defendants

removed to the United States District Court for the Eastern District of New York.  Defendant

Lowe has been given until May 20, 2009 to Answer or otherwise Plead.

### III.    ARGUMENT

#### A.  **The Automatic Stay is Designed to Protect a Debtor's Ability to Reorganize.**

Section 362(a) provides one of the most fundamental protections afforded to debtors by

preventing the piecemeal destruction of the debtor's property. Without the stay provided by 11

U.S.C. § 362(a), there would be a race to the courthouse to claim assets of the debtor, and a

successful reorganization would be impossible.  The automatic stay protects the debtor's assets

while giving the debtor breathing room so that it can reorganize.  Section 362(a) bars "the

commencement or continuation, including the issuance or employment of process, of a judicial,

administrative, or other action or proceeding against the debtor that was or could have been

commenced before the commencement of the case under this title. . . ."  11 U.S.C. § 362(a).

#### B.  **The Stay is Extended to Enjoin Litigation against Non-Debtors in Circumstances that Exist in this Case.**

Section 362(a) automatically stays actions against the debtor.  It does not, however, stay

actions against third-parties.  Nonetheless, courts recognize that in some situations, the

protections of the automatic stay would be rendered nugatory if an action against a third-party is

allowed to proceed.  Thus, courts recognize that the protection from litigation afforded by the

automatic stay can be extended to non-debtors.  The authority for extending the stay to third-

parties, or enjoining actions against third-parties, is § 105 of the Bankruptcy Code, which

provides that a bankruptcy court "may issue any order, process or judgment that is necessary or

appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

##### 1.  The Identity of Interest Test

In *El Puerto De Liverpool S.A. De C.V. v. Servi Mundo Llantero, U.S.A. (In re Kmart Corp.)*, 285 B.R. 679, 688 (Bankr. N.D. Ill. 2002), Judge Schmetterer observed that courts have extended the protection of the stay to nondebtors under certain conditions and that:

> Authority in this Circuit has adopted this rule and articulated two exceptions to the general rule that bars extension of the stay to nondebtors: the first is where there is sufficient identity between the debtor and nondebtor such that the litigation against the nondebtor threatens property of the estate, and the second is where the continuation of the proceedings against the nondebtor could cause irreparable harm to the debtor by diverting resources need for its reorganization. *Fernstrom*, 938 F.2d at 736.  Cases illustrating the first exception include situations where the debtor has an absolute duty to indemnify the nondebtor either by contract or operation of law or where the costs of the nondebtor's defense are borne by the debtor. *See Trimec, Inc. v. Zale Corporation*, 150 B.R. 685, 687 (N.D. Ill. 1993) (staying proceeding against a joint venturer where the debtor was a guarantor of joint venturer); *In re Eagle-Picher Industries, Inc.*, 963 F.2d 855, 860 (6th Cir. 1992) (upholding injunction where debtor had to indemnify its executives and reimburse legal cost); *A. H. Robins*, 788 F.2d at 1007 (same); *In re American Film Technologies*, 175 B.R. 847, 850-51 (Bankr. D. Del. 1994) (enjoining suit against officers of debtor because of indemnification and collateral estoppel).

Accordingly, in this Circuit, there are two prevailing tests for enjoining actions against third-parties.  Under one test, which is known as the identity of interest test, the stay can be extended to a third-parties where "there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor."  *In re Fernstrom Storage and Van Co.*, 938 F.2d 731, 736 (7th Cir. 1991) (*quoting A.H. Robins Co. v. Piccinin,* 788 F.2d 994, 999 (4th Cir. 1986)).

The "identity of interest" test was articulated in *A. H. Robins*, where the Fourth Circuit held that nondebtor co-defendants of the debtor were entitled to enjoin proceedings against them where the co-defendants were indemnified by the debtor and were also insured under the debtor's insurance policy.  *Id*. at 1007-08. The court reasoned that § 105 empowered the trial

court to enjoin actions that would frustrate or potentially thwart the debtor's ability to reorganize. *Id.* at 1003-08.

In *In re Fernstrom Storage and Van Co.*, 938 F.2d 731, 736 (7th Cir. 1991), the Seventh Circuit accepted *Robins* and articulated two scenarios where § 362 should be extended to nondebtors: (1) identity between the debtor and nondebtor such that the litigation against the nondebtor threatens property of the estate, and (2) where the continuation of the proceedings against the nondebtor could cause irreparable harm to the debtor by diverting resources need for its reorganization. *In re Fernstrom Storage and Van Co.*, 938 F.2d 731, 736 (7th Cir. 1991).

Subsequent to *Fernstrom*, courts in the Northern District of Illinois have refined the applicable test by recognizing that the stay should be extended to protect non-debtors where, like here, the debtor has an absolute duty to indemnify the nondebtor either by contract or operation of law or where the costs of the nondebtor's defense are borne by the debtor.  Courts also have extended the stay to protect nondebtors where the debtor's key personnel are diverted from the reorganization by the demands of the litigation. *Fernstrom,* 938 F.2d at 736.  In particular, § 105(a) may be used to assure the orderly conduct of the reorganization proceedings. *In re Continental Airlines, Inc.,* 177 B.R. 475, 479-81 (D. Del. 1993) (enjoining suit against officers of debtor which could distract debtor from reorganization); *In re Sudbury, Inc.*, 140 B.R. 461, 465 (Bankr. N. D. OH 1992) (irreparable harm results when resources of debtor are consumed in third-party litigation); *Forty-Eight Insulations, Inc. v. Lipke (In re Forty-Eight Insulations, Inc.)*, 54 Bankr. 905, 909 (Bankr. N.D. Ill. 1985) (noting §105 extensions "generally involve the debtor's principal officers, shareholders, and directors.").

2.  The Irreparable Harm Test

As noted above, in *Fernstrom*, the Seventh Circuit also held that the stay may be extended where the continuation of the proceedings against the nondebtor could cause irreparable harm to the debtor by diverting resources need for its reorganization.  In *Fisher v. Apostolou*, 155 F.3d 876, 882 (7th Cir. Ill. 1998), the Circuit extended this holding and held that a bankruptcy court could enjoin claims involving third parties "when it is satisfied that such proceedings would defeat or impair its jurisdiction over the case before it. In other words, the court does not need to demonstrate an inadequate remedy at law or irreparable harm." *Id. See also Matter of L & S Indus., Inc.*, 989 F.2d 929, 932 (7th Cir. 1993).  The principal concerns for the bankruptcy court is the likelihood of success on the merits and the balance of the public interest.  *In re L&S Industries, Inc.,* 989 F.2d 929, 932 (7th Cir. 1993).

**C.**   **The Litigation against the Individual Defendants Should Be Stayed.**

1.   Varitalk Will Suffer Irreparable Harm Absent an Injunction.

Whether the Court applies the "identity test" or applies the traditional four factors for an injunction, the result is the same: the litigation against the Individual Defendants should be stayed pending the confirmation of a plan.  First, Varitalk plainly will suffer irreparable harm if the California action is not enjoined.  Goldberg and Lowe are Varitalk's President and Chairman, respectively.  They are both Directors.  As explained above, the upcoming trial of the California Action will require their presence in a California court for an extended period of time and will take them away from critical operations.  In their absence, Varitalk's ability to continue as a going concern will be undermined substantially and Varitalk will, in all likelihood, have to liquidate under Chapter 7.  It is precisely this type of harm that justifies the Court's use of its powers under § 105 to stay the California litigation.

Additionally, Drimmer was a former officer of the company and the claims against Drimmer occurred during the time when he was an officer of Varitalk.  In the event litigation proceeds against Drimmer alone, the testimony and involvement of Lowe and Goldberg will be needed, thereby distracting them from mission critical functions related to Varitalk.  Varitalk also is required to pay for the costs of the litigation and any judgments that might be lodged against Drimmer.

There also is an identity of interest between Varitalk and the Individual Defendants in that a judgment against them will be tantamount to a judgment against Varitalk.  In *El Puerto De Liverpool S.A. De C.V.,* 285 B.R. at 688, Judge Schmetterer did not extend the stay to a third party, but only because its rights to contribution from the debtor were not contractually-based and required a separate proceeding.  Varitalk's bylaws require it to indemnify all three Individual Defendants.  The right to indemnification is absolute and will not require a separate proceeding. This fact alone has led courts to enjoin litigation against third-parties.

Finally, there is a substantial identity between the claims against Drimmer, Lowe and Goldberg and the claim against Varitalk.  For example, one of the claims against Lowe alleges that Baker is the inventor of Varitalk's patents, and not Lowe.  If Baker prevails on that claim against Lowe, there will be a large potential impact upon Varitalk's assets and this bankruptcy case.

        2.   <u>Varitalk Has A Likelihood of Reorganizing.</u>

As noted above, Varitalk is an industry leader in personalized media.  It has been successful in the past and believes it can and will be successful in the future, assuming that it can continue to operate without the substantial disruption of two major pieces of litigation.

Indeed, if Varitalk can effectively deal with the California Action and the New York

Action, its future is bright.  Before the filing of the California litigation, Varitalk was poised to

generate profits and to expand its business operations.  Prior to 2009, it has seen increasing

revenues every year for the last three year.  It is not until the first quarter of 2009 – when Lowe

and Goldberg were consumed with this litigation – that sales have slowed.  Moreover, the

marquis list of clients that have accepted Varitalk's products and services tends to be further

indicia of Varitalk's viability and demand in the market.

Varitalk, through Drimmer, also is in negotiations to enter into a long-term high-volume

service agreement with a private label client.  It also has recently started entering into long-term

service contracts to support and integrate with Disney television shows.  Recently, Varitalk also

has started new product lines.

### 3.   The Public Interest is Best Served by an Injunction

Varitalk submits the public interest is best served if the stay is extended to the Individual

Defendants.  Among other things, staying that litigation will conserve judicial resources.  Due to

the overlap in the claims and factual allegations asserted against the Individual Defendants and

Varitalk, staying the case against the Individual Defendants will help avoid duplicative

proceedings and potentially inconsistent results.

Further, the public has an interest in a successful reorganization of Varitalk.  Here, jobs

are at stake.  For many of Varitalk's employees, the income from the debtor is the only

household income and the detrimental impact of continuing the litigation (which will assuredly

drive Varitalk into a liquidation) on those employees is a factor that urges the litigation to be

stayed.

The public interest also favors the issuance of a stay because the suits in California and New York are baseless and, at least with respect to the California suit, designed to stymie competition. A court is likely to find with respect to the California suit that (1) Baker had no Trade Secrets, (2) defendants did not misappropriate any Trade Secrets, (3) there was no fiduciary obligations owing to Baker, (4) plaintiffs have no standing to assert the claims they have brought, (5) plaintiffs suffered no damages, (6) the claims should have been brought years ago and are now time barred, and (7) the claims are barred by unclean hands, waiver, equitable estoppel and a failure to mitigate damages. As noted above, the District Court in California already has indicated that Varitalk has the better case and that the claims against Goldberg are weak. All of these matters indicate that Baker and Eclipse filed the suit not to remedy a legally cognizable wrong, but instead to Varitalk as a competitor. This is not a proper basis for litigation and the counterclaim Varitalk filed will expose this unlawful scheme. Ultimately, staying the California action thus serves the public's interest in fostering competition by preventing Baker from abusing legal process to eliminate a competitor.

    4.   The Defendants in the California Suit and the New York Suit Will not be
           <u>Adversely Impacted by a stay of the pending litigation</u>

Finally, Varitalk submits staying the litigation does not negatively affect the plaintiffs in the California or the New York suit. There is no likelihood of witnesses losing their memory (or, at least, no more likelihood exists today than was caused by Baker's five year delay in bringing this Complaint). The evidence is documentary and is not subject to going stale or being lost. If anything, delay enables plaintiff to obtain the expert report that was not previously ready to be produced. It also allows time to hold a claim construction hearing, possibly eliminating the Patents from the litigation, to great savings of both sides. Finally, solely for the sake of argument, to the extent that Baker succeeds (which is not going to happen) on the merits of his

claims, enforcement of any judgment requires a viable company.  As such, staying the litigation

to allow the company to successfully reorganize actually benefits Baker.

## IV.    CONCLUSION

WHEREFORE, Varitalk respectfully requests that the Court enter a Preliminary

Injunction that:

1)      Enjoins the continuation of the litigation currently pending in the United States

District Court for the Central District of California, 2:07-CV-6622, *Baker v. Varitalk, et. al*. as to

the debtor Varitalk and the individual Defendants in that suit, Stephen Drimmer, Frederick

Lowe, and Derek Goldberg; and

2)      Enjoins the United States District Court for the Eastern District of New York

from continuing the litigation in *Lanzarotti v. Varitalk et al*, as to the debtor, Varitalk, and the

named individual Defendants, Frederick Lowe and Derek Goldberg.

3)      Provides such further relief as is just and proper.

Respectfully Submitted,

Varitalk, Inc.

By: /s/ William J. Factor
     One of Its Attorneys

William J. Factor (6205675)
The Law Office of William J. Factor, Ltd.
1363 Shermer Road, Suite 224
Northbrook, IL  60062
(847) 239-7248
(847) 574-8233
wfactor@wfactorlaw.com

Robert Gray
The Law Offices of Ralph J. Schindler
53 West Jackson Blvd., Suite 818
Chicago, IL  60604
(312) 554-1040
(312) 554-1041
rgray@schindlerlegal.com